IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JESSICA N. ROGERS, as personal
representative of the Estate of Jose F.
Escano-Reyes, and as parent and
natural guardian of Y.C., a minor child,

        Plaintiff,

   v.                                                Case No.: 3:18cv571-RV/EMT

SHERIFF BOB JOHNSON, et al.,

        Defendants.
_____/

## ORDER

This is a sad case. On January 3, 2016, Jose Francisco Escano-Reyes (known as "Fran") was arrested by the Okaloosa County Sheriff's Office for driving without a license, and it was subsequently discovered that he was in the country illegally. On January 7, 2016, he was transported to the custody of the Santa Rosa County Sheriff's Office ("SRSO") and housed at the Santa Rosa County Jail ("Jail") pending removal proceedings. After three months at the Jail, his mental condition began to deteriorate and he was put on suicide watch. On the morning of April 7, 2016, he hanged himself in his cell.

The plaintiff, Jessica N. Rogers, is the personal representative of Fran's estate and the natural parent of Y.C., his minor child. She brought this civil action asserting several claims against a number of SRSO employees, including Deputy John Gaddis and Deputy Michelle Bauman (together, "the Deputy Defendants"), and Sheriff Bob

Johnson.[1] As this action has winnowed down, the following six claims against these three defendants remain: claims for deliberate indifference to a serious medical need against the Deputy Defendants (counts 1 & 2); a failure to "supervise/policy/custom" claim against Sheriff Johnson pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) (count 5); and three counts of negligence under Florida state law against each defendant (counts 6-8).

Discovery is closed and the defendants now move for summary judgment (docs. 65, 66). The Deputy Defendants seek summary judgment on both the federal and state law claims, while Sheriff Johnson only seeks summary judgment on the *Monell* claim. The plaintiff has filed responses in opposition to the motions, and the defendants have filed replies in further support. The plaintiff sought and was granted leave to file a sur-reply to Sheriff Johnson's reply.

## I. Standard of Review

Summary judgment is appropriate if all the pleadings, discovery, affidavits, and disclosure materials on file show that there is no genuine disputed issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to prove the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Summary judgment is inappropriate "[i]f a reasonable factfinder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact[.]" *Allen v. Board of Public Educ. for Bibb*

---

[1] The plaintiff originally named Sergeants Judith McPhail and Russell Wright as defendants, but they were dismissed earlier in the case and will not be discussed further in this order.

*County*, 495 F.3d 1306, 1315 (11th Cir. 2007). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the record, viewed as a whole, could lead a reasonable fact finder to return a verdict for the non-movant. *Id.*

In considering a motion for summary judgment, the record must be construed in the light most favorable to the non-movant; all reasonable inferences are drawn in her favor; and her evidence must be believed. *Allen*, 495 F.3d at 1315; *see also Shaw v. City of Selma, Ala.*, 884 F.3d 1093, 1098 (11th Cir. 2018). When there is a video, the court must "view the facts in the light depicted by the videotape." *Shaw*, 884 F.3d at 1098 (citation omitted).

## II. Background

Most of the pertinent events are depicted on a video, which has been provided to the court and which I have viewed. In addition, I have read the Deputy Defendants' depositions in full, along with both deposition testimonies of Captain Barbara Stearns, the designated corporate representative of the Jail. Viewed in the light most favorable to the plaintiff, with all reasonable inferences drawn in her favor, the evidence shows the following facts.

As previously noted, Fran was booked into the Jail on January 7, 2016. At that time (and for several months thereafter) he apparently didn't exhibit any mental health problems, nor did he complain, cause disruptions, or disobey any orders from deputies or jail officials. On April 2, 2016, Fran told jail officials that he wanted to die and that he planned to kill himself. In response, he was moved from general population to the medical unit, where he was put on suicide watch. By virtue of being on suicide watch, Fran posed a risk of self-harm and thus had a serious medical need. *See, e.g.,* Gaddis Dep. at 91-93, 111-12; Bauman Dep. at 47, 55-56, 75, 81-83; *see also* Stearns Dep. at 39-40 ("Q: Does the Jail believe that on the date in question Mr. Escano-Reyes had

a serious medical need? A: Based on the fact that he was on suicide watch, yes."). In fact, not only do suicidal inmates like Fran have a serious medical need, but they have *the* most serious medical need in the entire Jail. *See* Gaddis Dep. at 91-92 (testifying that ensuring a suicidal inmate's safety is "the most significant" medical concern at the Jail); Bauman Dep. at 81 (agreeing that the risk of suicide is "probably the most serious medical need that people had at the Jail"). To meet that serious medical need, deputies are required to "directly observe" inmates while they are on suicide watch. "Direct observation" is defined in the Florida Model Jail Standards (which the Jail is bound by) as "continuous visual observation 24 hours each day." The Jail's Standard Operating Procedure 15.32 similarly provides: "Inmates considered to be suicidal will be under 'direct visual observation by a deputy/nurse 24 hours a day.'"

Supervising deputies were also expected to comply with General Order (GO) O-030II(D), which states that suicidal inmates who are being housed in a single cell must be "under direct continuous observation *with documented staggered 15-minute physical checks.*" (Emphasis added). Despite that the Florida Model Jail Standards required "continuous visual observation 24 hours each day," on the morning of April 7th the Jail interpreted and applied GO O-030II(D) to only require that the supervising deputies be in the same general area of the inmate and thus "*available* and *capable* to do the 15 minute close watch checks." *See* Stearns Dep. at 77 (emphasis added). They were not required to watch the inmate 24 hours per day. *Id.*; *see also id.* at 70-72, 92-93, 98.

At the time relevant to this case, the deputies in charge of supervising inmates on suicide watch were expected to conduct their "staggered" physical checks and fill out a "close watch form" to certify they checked on the inmate every fifteen minutes. *See, e.g.,* Gaddis Dep. 111-12, 173; Bauman Dep. at 49, 203. In addition to the fifteen

minute staggered physical checks, the Jail has conceded that if an inmate on suicide watch starts screaming, the supervising deputies should generally investigate the cause of his distress. *See* Stearns Dep. at 258.

When Fran was moved from general population to the medical unit and put on suicide watch, he was outfitted in a suicide prevention garment known as a "suicide smock." *See* Stearns Dep. at 184-86. The Jail was aware that the suicide smocks could become "more pliable" over time, but it did not evaluate the condition of the smock (nor did it know how old the smock was) before giving it to him. *See id.*

For several days after he was transferred to the medical unit, Fran demonstrated bizarre and uncooperative behavior, including saying that he didn't understand why he was there since he was praying; screaming "I want to get out of here!;" refusing to participate in his mental health evaluations; shouting, kicking and banging on the door to the medical unit; and beating on the telephone to the point where his fists bled and he had to be treated for bloody knuckles, swollen joints, and a possible contusion. *See also* Bauman Dep. 60, 65 (testifying that Fran was "yelling at the wall and exhibiting . . . consistent bizarre behavior," including "speaking of things that probably weren't there").

On April 6, 2016, after he continued to show erratic behavior, Fran was moved from the medical unit to the Admissions, Classification, and Release ("ACR") unit. *See* Stearns Dep. at 160. The ACR unit is right next to the medical unit—separated by a small hallway that takes just a few seconds to walk—and suicidal inmates who are being disruptive are frequently sent there so that they won't interfere with the medical staff as they do their jobs. *See* Bauman Dep. at 131-32, 171-72; Stearns Dep. at 157-59, 174. A suicidal inmate was expected to be supervised in the exact same way (i.e., 24-hour continuous observation with staggered 15 minute physical checks) regardless of whether he is housed in the medical unit or in the ACR. *See* Bauman Dep. at 132.

When he was moved to ACR, Fran was assigned cell number 1 ("ACR-1"), a single holding cell that is just a few feet away from the booking desk. Although it was near the booking desk, the deputies who monitored the ACR unit did not have a clear line of sight from the desk to ACR-1. *See* Gaddis Dep. at 120-21; *accord* Stearns Dep. at 155 (acknowledging the "obstructed view of the cell from where the officer's desk was"). ACR-1 was also the only cell in the ACR unit that had a metal partition capable of being used to hang a ligature. *See* Gaddis Dep. at 23-24; Bauman Dep. at 170-71. Nevertheless, despite the obstructed view and metal partition, using ACR-1 to house suicidal inmates was "consistent with policy" at that time. *See* Stearns Dep. at 144.

The Jail also had a policy and practice of covering the main windows of cell doors in the ACR unit—including ACR-1—with a velcro curtain, while a plastic bag was put over the bottom half of the smaller and narrower window running the length of the door. This well known and longstanding policy and practice was done so that deputies (particularly female deputies) wouldn't have to see an inmate who was naked or masturbating. *See* Gaddis Dep. at 180-82 (the purpose of this "general custom and practice" was so that female deputies wouldn't have to see something they might find "abhorrent"); Bauman Dep. at 142-43 ("That's why they put the plastic covering on the window, to hide, 'cause that way no passerbys see him naked."). The curtain and plastic blocked the view of all but a small "sliver" of the inside of the cell and made it impossible to view the full cell without going to the cell door and looking through the small portion that was left uncovered.

There are video cameras and audio equipment in the ACR unit that record both the booking desk area and the interior of ACR-1. However, the video feed of the cell was not displayed on a monitor at the booking desk; rather, it was only displayed in the Central Control Room where hundreds of other monitors were being watched by a single person. *See* Gaddis Dep. at 17, 20; Bauman Dep. at 196-98, 215. There is no

evidence that anyone in the control room observed Fran on the video feed from ACR-1 at the time of his suicide.

During his first day in the ACR unit Fran was seen pacing in his cell, spitting on the floor, and making delusional statements such as "the camera . . . will show the prophecies." He screamed loudly and repeatedly that he needed to be killed and that he wanted to die. At about 11:12 p.m., he began "mule-kicking' his cell door—which the Jail concedes was "self-harming behavior," *see* Stearns Dep. at 250—and he was placed in a restraint chair for several hours (into the early morning hours of April 7th), after which he was returned to ACR-1.

On the morning of April 7, 2016, the Deputy Defendants began their shift at 6:45. Prior to assuming their duties that morning, the deputies gathered with other deputies for their daily briefing, which is called "muster." The Deputy Defendants were told that Fran had been put on suicide watch—and that they were responsible for supervising him, *see* Bauman Dep. at 203; Stearns Dep. at 41—and they subjectively knew there was a risk that he might commit suicide. *See* Gaddis Dep. at 45-46, 91; Bauman Dep. at 82-83, 114-15.[2]

The Deputy Defendants had joint and equal responsibility for observing Fran that morning, and they were expected to conduct and document the physical checks every fifteen minutes. *See* Gaddis Dep. at 174; Bauman Dep. at 123, 128. Despite this shared responsibility, however, the Deputy Defendants didn't discuss who would do what and when. That wasn't how the Jail operated. *See* Gaddis Dep. at 94 (testifying they didn't have "an organized system in place at that time as to who would be doing

---

[2]

Although Deputy Gaddis intimated at one point in his deposition that he thought there was a possibility Fran was "crying wolf" [Gaddis Dep. at 189-91], he conceded that he also knew there was a "very real possibility" that he was genuinely suicidal and might try to take his own life. *See id.* at 91. Indeed, it is undisputed that Fran had engaged in the self-harming behavior just a few hours before that morning's muster, and Deputy Gaddis had access to the incident report. *See id.* at 157-58.

those fifteen minute checks . . . . It was sort of like ad hoc"); Bauman Dep. at 115, 192-94 (testifying that at the time it wasn't "general practice" to discuss "who would check what, when, or anything along those lines;" we always just "assumed it would get done").

According to the video footage of his cell, Fran awoke that morning at 8:15. At 8:59, he removed his suicide smock and tied it in a knot around the metal partition. He put the smock back on a few minutes later. He removed the smock again at 9:08, and he again tied it around the metal partition. During this time he was pacing around his cell naked and yelling in Spanish. Both Deputy Defendants heard him "continuously" shouting for an hour or more, *see* Gaddis Dep. at 52-55, 153-54; Bauman Dep. at 86-87, but neither deputy spoke Spanish so they didn't know what he was shouting. *See* Gaddis Dep. at 53, 155 (testifying that nobody in the ACR unit spoke Spanish).[3]

At various points during that morning Fran attempted to choke himself with his own hands; he reached into his toilet and stuck his fingers down his throat; and he put his head into the ligature and tried to hang himself *nine times.* At 10:25, he inserted his head into the ligature for the tenth and final time and was able to hang himself. His body was discovered at 10:45 a.m., when another inmate happened to walk by his cell, peered through the only exposed "sliver" portion of his window, and told the Deputy Defendants "that guy's hanging."

---

[3]

As previously noted, the Jail recorded audio in the ACR as well as video. Captain Stearns, the designated Jail representative, initially testified during her deposition that she personally listened to the audio from the morning of Fran's suicide. *See* Stearns Dep. at 125-28, 130-31. In fact, she testified very specifically that she was provided a CD of the audio as "part of the inmate file" that was compiled the day of the incident and that she listened to 25-30 minutes of the audio in her office on her computer. *See id.* After speaking with counsel, however, she changed her testimony and said that there actually was no audio because the audio feed had malfunctioned that day. *See id.* at 220 (testifying that "evidently I had misspoken . . . I guess I misspoke when I told you we had audio"). She conceded that she had no knowledge of the audio ever malfunctioning before and doesn't know what caused it this time. *See id.* at 129, 134. Consequently, there is no record of (and thus we cannot ascertain) what Fran was shouting prior to his suicide.

The video shows that at no point during the approximately one hour and forty-five minutes from the time Fran first removed his suicide smock to the time the inmate discovered him hanging did either of the Deputy Defendants walk the few steps to his cell and physically check on him—not even when he was shouting for over an hour. Instead, they mostly remained seated behind the booking desk just outside his cell. *See* Gaddis Dep. at 118 ("Q: Did you move from that chair? A: Did I physically get up out of that chair? No. . . . Q: [Y]ou stayed in the same position the entire time? A: I stayed in the same chair."); Bauman Dep. at 91, 110 (testifying that they "mostly" remained seated at the desk); *accord id.* at 116 ("Q: [So] it's your recollection that both of you all were sitting there, essentially the whole time? A: For the most part.").[4]

In addition to staying seated at the desk and not observing Fran that morning, it is undisputed that Deputy Gaddis lied on the close watch form and said that he had conducted multiple physical checks even though he hadn't. *See* Gaddis Dep. at 59, 98,

---

[4] The Deputy Defendants note that the video shows that several times that morning Fran was standing near the door to his cell, and thus (even though they didn't get up from their chairs) they suggest that constitutes physical observation. There are at least two problems with this. First, as the Deputy Defendants admit, they didn't mention anywhere on the close watch form that they saw him at the cell door during any of those times. *See* Gaddis Dep. at 163-65; Bauman Dep. 91-92, 133, 135, 138, 149, 210. Second, there are some inconsistencies in the record on what, if anything, they saw on those occasions. To note just one example, the video footage shows that Fran was standing at his door at 10:15, and Deputy Bauman initially testified at her deposition that she saw him that time and she believed it was "sufficiently compliant" with her responsibility to perform a close watch check. *See* Bauman Dep. at 148. However, upon further questioning and after being confronted with the video itself (which actually shows that she was *not* looking toward Fran's cell when he was standing at the door), the most she could say was that it was "*possible*" that she *may* have seen him "out of the corner of my eye," although she conceded "I don't have a direct memory of this." *Id.* at 148-50 (emphasis added); *accord id.* at 151 ("I don't have a memory of this per the event, but watching the video it's not out of the question to say I could see him out of the corner of my eye."). Whether and to what extent the Deputy Defendants actually saw Fran at the door of his cell—and whether and to what extent that constitutes physical observation—is therefore unclear. Viewing the full record in the light most favorable to the plaintiff (and resolving all ambiguities in her favor), a reasonable jury could find that the Deputy Defendants did not see Fran standing at his door at any point during this period of time.

173, 186-87. It is also undisputed that Deputy Gaddis spent some time that morning checking his personal email account and Facebook page, *see* Gaddis Dep. at 141-44, and talking with Deputy Bauman and several other SRSO employees (including his ex-wife) who walked by the booking desk. *See id.* at 131-37; *see also* Bauman Dep. at 146 (acknowledging a portion of the video recording showing that she was talking with Deputy Gaddis and other people).[5]

The Jail made several changes in policy after Fran's suicide. Specifically, the Jail no longer uses the suicide smocks (it now uses paper gowns), *see* Gaddis Dep. at 38; Bauman Dep. at 176; it no longer uses ACR-1 to house suicidal inmates (because of its obstructed view and metal partition), *see* Bauman Dep. at 184-85; Stearns Dep. at 155; and it now requires true "continuous observation" of inmates on suicide watch (which means that deputies are assigned to literally sit "right in front of the cell" and continuously watch the inmates through the window 24 hours each day). *See* Bauman Dep. at 182-83.[6]

In addition to the above evidence, Deputy Gaddis, Deputy Bauman, and Captain Stearns testified more specifically as follows:

---

[5] In a sadly ironic twist, Deputy Gaddis testified that the conversation they were having at the desk concerned a work banquet that was scheduled for that night, where he had been nominated to receive a "lifesaving award." *See* Gaddis Dep. at 131-37.

[6] Captain Stearns testified that at the time relevant to this case the Jail believed that its duty to "continuously observe" only required its deputies to conduct and document staggered 15 minute checks. She testified that this then-policy was based on a faulty interpretation of the Florida Model Jail Standards, which (as previously noted) in fact required continuous observation 24 hours per day. *See* Stearns Dep. II at 60-61 (conceding that after Fran's suicide the Jail discovered that it had not been monitoring suicidal inmates in compliance with the Florida Model Jail Standards, so the Jail changed its policy to bring the Jail into compliance). Nevertheless, on the day of Fran's suicide, the Deputy Defendants were required to at least check him every 15 minutes—but as already noted, and will be seen further *infra*, a reasonable jury could find they failed to even do that.

## *Deputy Gaddis*

Deputy Gaddis knew on the morning of April 7th that Fran posed a risk of self harm and that there was a "very real possibility" he would try to commit suicide. *See* Gaddis Dep. at 91. Thus, he agreed it was "common sense" that he should have been checked every 15 minutes. *See id.* at 111-12. However, Deputy Gaddis testified that it was his "normal practice" to get up from his chair and physically check on suicidal inmates every 15 minutes only if he couldn't see them at their door/window *or hear* them. *See id.* at 51-52. Because Fran spent much of the morning shouting in Spanish, Deputy Gaddis felt that Fran had been "seen *or heard*" almost every 15 minutes. *See id.* 40-41, 51-52. But—and this is very important—Deputy Gaddis conceded that it was possible Fran could have been trying to hurt himself at the same time that he was heard shouting:

> Q: Okay. So do you agree with me that the inmate could have been doing literally anything . . . in his cell while he was screaming and you would not have been able to confirm what it was in fact that he was doing in that window of time?
>
> [object to form]
>
> A: That's possible, yes. . . . I think it's possible he could be doing something. I could not visually verify that he was doing this or doing that. I heard.
>
> Q: Right. What I'm saying is, could someone be shouting at the same time that they were hurting themselves.
>
> A: Of course, yes.
>
> Q: Okay. So do you believe it's possible that during that window of time Mr. Escana-Reyes was, while Mr. Escano-Reyes could be heard shouting, that he also could have been attempting to hurt himself.

A: Yes.

Q: Okay. Did you understand that to be true during the time in question? . . . That he could have been [trying to hurt himself]?

[object to form]

*A: That he could have been, yes.*

Q: Okay. And you didn't physically check; correct?

A: That is correct.

\* \* \*

Q: Okay. So if you had checked, what do you think you would have seen?

[object to form]

A: I would have seen him trying to tie a knot in that suicide prevention garment. I would have seen him pacing the cell—the cell. That's what I would have seen.

Q: How certain are you that you would have been able to see Mr. Escano-Reyes attempting to hang himself before he did in fact hang himself on the morning of the date in question had you gone to observe it?

[object to form]

A: I'm a hundred percent sure I would have seen him.

*Id.* at 154-56 (emphasis added).

Notably, Deputy Gaddis testified that if Fran had been shouting suicidal threats (which we don't know), he would have gone to the cell, escorted him to another room,

removed the suicide smock, and put him in a restraint chair. *See id.* at 53-54. But, he never got up and tried to determine what Fran was shouting in Spanish because he was "*[not] at all curious or concerned about what he was saying.*" *See id.* at 55 (emphasis added). In fact, he admits that after 10:00 that morning he doesn't recall even "*looking over there [toward the cell] at all.*" *See id.* at 138 (emphasis added); *accord id.* at 138-39 (testifying that as far as he knows Fran was "completely unobserved" after 10:00).

After an investigation, Deputy Gaddis was disciplined for the incident. *See id.* at 42. It was determined that he lied on the close watch form and willfully neglected his job duties, *see id.* at 43, 105, and he doesn't dispute those determinations. *See id.* at 59, 98, 173, 186-87 (admitting that he lied on the close watch form); *see also id.* at 105 ("Q: And you agree with the finding of willful neglect of job duties; correct? A: Willful neglect. Yes."). Ultimately, Deputy Gaddis admitted during his deposition that he acted "deliberately" and "knowingly," *see id.* at 113-14, and that he "disregarded" Fran's serious medical needs. *See id.* at 188.

### *Deputy Bauman*

Deputy Bauman was aware that prior to his suicide Fran was behaving wildly and erratically by, *inter alia*, "yelling at the wall." *See* Bauman Dep. at 56, 60, 65. She thus knew (had "no doubt") that he was at risk for suicide. *See id.* at 82. Nevertheless, she never went to the window to investigate his distress or to otherwise check on him that morning. *See id.* at 95-96. She readily admits that this violated her duty to care for him. *See id.* at 106-07 ("Q: [W]ould you agree that you did not comply with your obligation to check him every fifteen minutes? A: Correct. . . . Q: Did you know you screwed up in the course of that morning? A: Yes."); *see also id.* at 168-69 (conceding that she didn't show proper "regard for his life"). If she had checked on him during that morning, she admits that she would have seen him "attempting to hang himself . . . a few times," which is the point of the 15 minute physical checks in the first place.

*See id.* at 100-01 ("Q: Is the reason that you're supposed to do [the 15 minute checks] to be on the lookout for things such as exactly what happened in the hour and half or so before he died? A: Right."); *see also id.* at 99 (acknowledging that the whole point of the physical checks is to observe their "actions" and to "make sure they're alive").

Like Deputy Gaddis, Deputy Bauman was disciplined for her conduct in this case. *See id.* at 161-62. She was found to have willfully neglected her duties, and she readily admits that she did so. *See id.* at 161-65 (agreeing that she "made the choice" to neglect her duties); *see also id.* at 223-24 (conceding that she "willfully neglected other components of [her] responsibilities that morning").

Deputy Bauman testified that although deputies in charge of suicidal inmates were supposed to "continuously observe" them, that wasn't really how things were done at the time relevant to this case. *See id.* at 180; *see also id.* at 190 (testifying that "nobody" interpreted Jail policy that way). Even though it was "feasible" to have a deputy physically sit outside the cell door and continuously observe suicidal inmates 24 hours each day, *see id.* at *181-82—indeed, that is how it's done now, see id. at 182-83*—that was not "the general culture of how everybody worked in ACR" at the time. *Id.* at 193-94.

### *Captain Stearns*

Captain Stearns testified that the Jail knew Fran had a serious medical need and was at risk for suicide, but they knowingly moved him into a cell with an obstructed view from the booking desk. *See* Stearns Dep. at 39-40, 161. In addition, she concedes that the shade and curtain pulled over his cell further obstructed the view and rendered the monitoring of his cell "inadequate." *See id.* at 242-43. She acknowledges that the Deputy Defendants hardly got up from their chairs and thus didn't conduct their close watches properly and didn't conduct the physical checks as required. *See id.* at 60, 69, 143-44, 190, 226. In other words, they both failed to property monitor him. *See id.* at

209-13, 215, 262-63. As Captain Stearns acknowledged, if a suicidal inmate is ignored for a length of time then "self-harm has a high potential to occur." *See id.* at 176-77.

**III. Discussion**

Some cases are close on summary judgment, so they require lengthy analysis. This one isn't, so it doesn't.

*A. The Deputy Defendants' Motion*

The Deputy Defendants move for summary judgment as to both the deliberate indifference claims and the state law negligence claims. With respect to the former, they argue that they are entitled to qualified immunity. For the latter, they argue that the plaintiff has failed to show that their actions were wanton and willful, as required by Fla. Stat. § 768.28(9).[7]

Qualified immunity protects government officials who have been sued in their individual capacity "'unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) (citation omitted). To be entitled to qualified immunity, the government official must first establish that he was acting within his discretionary authority at the time of the allegedly unlawful conduct. *Id.* Because it is undisputed that the Deputy Defendants were performing discretionary governmental functions at the relevant time, the burden shifts to the plaintiff to show (1) that the Deputy Defendants violated the particular constitutional right at issue (i.e.,

---

[7] Section 768.28(9) provides, in relevant part, that no state officer, employee or agent shall be personally liable in tort for injury or damage sustained as the result of "any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted . . . in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

deliberate indifference to serious medical need), and (2) that those rights were clearly established at the relevant time. *Id.* at 1281. To show the former, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). The plaintiff has easily proven these three facts for purposes of summary judgment. The Deputy Defendants have testified that they subjectively knew that Fran had a risk of serious harm and they admit to disregarding and "willfully neglecting" that risk, thereby violating his constitutional rights. The inquiry thus shifts to whether the right at issue was "clearly established." This can be shown in three ways:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the relevant State Supreme Court.

*King v. Pridmore,* 961 F.3d 1135, 1146 (11th Cir. 2020) (Vinson, J.) (multiple citations and brackets omitted). The second and third methods are known as "obvious clarity" cases. *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017) (Vinson, J.). "They exist where the words of the federal statute or constitutional provision at issue are so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful, or where the case law that does exist is so clear and broad (and not tied to particularized facts) that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.*

Whether based on a materially similar case on point, *see, e.g., Snow v. City of Citronelle, Alabama,* 420 F.3d 1262 (11th Cir. 2005) (holding that as of 2005 it was clearly established that a jail official who has subjective knowledge of a serous risk of suicide and takes no action to prevent it violates the constitution), or the obvious clarity exceptions, I have no difficulty concluding that what the Deputy Defendants allegedly did in this case (or, more accurately, what they *didn't* do) violated Fran's clearly established constitutional rights. To be sure, "[q]ualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights." *See Gaines*, 871 F.3d at 1207. Because a reasonable jury considering this evidence could (not must, but could) find that the Deputy Defendants fit the preceding description, qualified immunity is inappropriate on this record.

As for the state law claims, summary judgment is inappropriate if a reasonable jury could find that the Deputy Defendants acted willfully and wantonly. "Willfully" means "intentionally, knowingly and purposely." *Peterson v. Pollack*, 290 So.3d 102, 110 (Fla. 4th DCA 2020). "Wantonly" is defined as "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property." *Id.* It has been said that willful and wanton is the "equivalent" of reckless conduct. *Williams v. City of Minneola*, 619 So. 2d 983, 986 (Fla. 5th DCA 1993); *accord Rushton v. State*, 395 So. 2d 610, 612 (Fla. 5th DCA 1981) (noting that "willful and wanton" and "reckless" are "often used interchangeably").In light of the testimony from the Deputy Defendants described above, a reasonable jury could find that they acted with recklessness or willful and wanton disregard for Fran's safety and well being. Indeed, as previously noted, the Deputy Defendants readily concede they "willfully neglected" the duties they owed to him.

Accordingly, the Deputy Defendants' motion for summary judgment must be, and is, denied.

## B. *Sheriff Johnson's Motion*

Sheriff Johnson's motion for summary judgment on the *Monell* claim fares no better.

"For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents." *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989). "A governmental entity is not liable under § 1983, merely as a matter of respondeat superior, for constitutional injuries inflicted by its employees." *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999). Rather, liability can only exist when the execution of a government policy—whether made by its lawmakers or by those whose edicts or acts can fairly be said to represent official policy—inflicts the injury. *See Monell*, 436 U.S. at 694. Custom which hasn't received official approval may also provide a basis for liability on a municipality or other local governmental body, provided that custom is "permanent and well settled." *Id.* at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970)). Thus, for Sheriff Johnson to be held liable, there must be a causal connection between the Jail's policies or customs and Fran's suicide. *See id.* at 691. An act can satisfy the causation requirement when the policy or custom was "the moving force of the constitutional violation." *Id.* at 694.

The plaintiff has identified three policies or customs that were the moving force behind Fran's death, all of which were discussed above. *First*, at the time relevant to this case, the Jail had a policy or custom of only requiring deputies to be in the same general vicinity of inmates on suicide watch so that the deputies could be "available"

and "capable" of physically checking on them every 15 minutes.[8] *Second*, the Jail had a policy or custom of housing suicidal inmates in ACR-1 even though it could not be fully viewed from the booking desk and even though it was the only cell in the entire jail that had a partition capable of hanging a ligature.[9] Third and finally, the Jail had a long standing and well settled policy or custom of covering cell doors and windows of suicidal inmates, even though (as Captain Stearns admitted) those coverings made it so that "adequate monitoring" could not occur.[10]

The plaintiff argues, and I agree, that a reasonable jury could find that there is a causal connection between these policies and customs and Fran's suicide. Summary judgment is thus improper for Sheriff Johnson as well.

## IV. Conclusion

This action arises out of a tragic and highly preventable suicide. As there are genuine disputed issues of material fact and evidence from which a jury could find for the plaintiff on each cause of action, the defendants' motions for summary judgment (docs. 65, 66) must be, and are, DENIED.

As the parties have already mediated the case without success, I will schedule this matter for a pretrial conference by separate order.

---

[8] Again, this policy or custom was changed after the incident in this case as it was determined that the staggered 15 minute checks did not constitute "continuous visual observation," as required by the Florida Model Jail Standards.

[9] This policy was also changed in the wake of Fran's suicide, and ACR-1 is no longer being used to house suicidal inmates.

[10] The record doesn't appear to reflect whether the Jail is still covering cell doors and windows, but in light of Captain Stearns' concession, I assume it is not.

DONE and ORDERED this 24th day of August, 2020

/s/ Roger Vinson
ROGER VINSON
Senior United States District Judge